**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Newport News Division

SHARON L. WILLIAMS,[1]

        Plaintiff,

v.                                                                      ACTION NO. 4:13cv53

CAROLYN W. COLVIN,
*Commissioner of the Social Security Administration*,

        Defendant.

**UNITED STATES MAGISTRATE JUDGE'S REPORT AND**
**RECOMMENDATION**

    Plaintiff brought this action under 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") that denied Plaintiff's claim for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

    This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by order of reference, dated July 25, 2013. This Court RECOMMENDS that the decision of the Commissioner be AFFIRMED.

---

[1] In all documents associated with this case, including medical records, transcripts, and letters and statements from Plaintiff and her family, Plaintiff is referred to as Shondra Williams. However, this court, for the purposes of captioning, is bound by the language of the Complaint, which refers to Plaintiff as Sharon Williams. ECF No. 3. Plaintiff is DIRECTED to provide the proper spelling of her name within ten days of the filing of this Report and Recommendation.

# I.  <u>PROCEDURAL BACKGROUND</u>

The plaintiff, Sharon L. Williams ("Plaintiff" or "Williams"), originally protectively filed applications for DIB and SSI on December 4, 2010 and January 15, 2011, respectively, alleging she had been disabled since October 7, 2009. R. 196-209.[2]  The applications stemmed from posttraumatic stress disorder, dissociative identity disorder, bipolar disorder, panic disorder, and depression. R. 248. The Commissioner denied Plaintiff's applications, both initially on June 23, 2011, R. 122-31, and upon reconsideration on October 26, 2011. R. 137-51.  At Plaintiff's request, a hearing before an Administrative Law Judge ("ALJ") took place on April 24, 2012, at which the Plaintiff, represented by counsel, her husband, and a Vocational Expert testified.  R. 50-75.  The ALJ denied Plaintiff's DIB and SSI claims on June 18, 2012. R. 21-40.  On November 2, 2012, the Appeals Council denied Plaintiff's request to review the ALJ's decision, making the ALJ's decision the Commissioner's final decision. R. 6-9.

Having exhausted all administrative remedies, Plaintiff requested additional time from the Appeals Council to file a civil action, R. 5, which was granted on March 23, 2013, R. 1-4. As a result, Plaintiff filed a motion on April 29, 2013, to proceed in forma pauperis in this Court (ECF No. 1), which was granted on May 2, 2013 (ECF No. 2).  Plaintiff's complaint was then filed with this Court on May 2, 2013.  ECF No. 3. Defendant filed an Answer to the Complaint on July 10, 2013. ECF No. 6. On July 26, 2013, an Order was entered directing the parties to file Motions for Summary Judgment. ECF No. 9. After asking for and receiving an extension of time to file (ECF Nos. 10 & 11), Plaintiff's Motion for Summary Judgment was submitted on October 15, 2013. ECF No. 12. Defendant Commissioner's Motion for Summary Judgment was filed on November 12, 2013. ECF No. 14. As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for a decision

---

[2] Page citations are to the administrative record previously filed by the Commissioner.

based on the memoranda.

## II. FACTUAL BACKGROUND

Plaintiff was born in 1974 and was thirty-five years old on her alleged onset date and thirty-eight years old on the date the ALJ issued his decision. R. 54. Plaintiff has a GED and training as a real estate appraiser, R. 55, 249, and her past work included working as a real estate appraiser, a cell phone counter salesperson and repairer, and a training clerk. R. 70-72, 228-35, 238-44, 268. Plaintiff filed her application for SSI and DIB on December 4, 2010 and January 15, 2011, alleging disability as of October 7, 2009, based on posttraumatic stress disorder, dissociative identity disorder, bipolar disorder, panic disorder, and depression. R. 196-209, 248. Her date last insured is December 31, 2012. R. 24.

### A. Medical Records Relating to Plaintiff's Condition

#### 1. Dr. Feely – Former Primary Care Physician

Plaintiff saw Robert E. Feely, Jr., M.D., from 2008 to 2009. R. 326-32. On March 20, 2008, Dr. McFeely found that Plaintiff showed symptoms consistent with fatigue, muscle pain, probable depression and mood disorder, among other ailments. R. 332. He opined that she enjoyed her job, but had increased stress at home. R. 332. In May of 2008, Plaintiff also showed signs of anxiety, depression, and premenstrual syndrome. R. 331. She complained of difficulties between she and her husband, and revealed that she nightly drank about six beers between the end of the work day and when she goes to sleep. R. 331. In June, Plaintiff saw a psychiatrist, who prescribed Strattera, R. 330, but in January of 2009, Dr. Feely indicated that she had not seen a psychiatrist after that visit, R. 329. He also opined that Plaintiff weaned herself off of all medication, smoking and drinking by August of 2008. R. 329. On June 4, 2009, Dr. Feely opined that Plaintiff did not feel overly depressed, but that Plaintiff's brother was temporarily

living with the family and he was "quite a challenge." R. 327.  Dr. Feely noted on July 2, 2009,

that Plaintiff had heavy bleeding and pain on the first day of her cycle.  R. 326.

### 2. Dr. McCracken – Primary Care Physician

Plaintiff received care from her primary care physician, Sinclair McCracken, M.D., and

his physician's assistant between December 2009 and May 2012.  R. 388-424, 467-72.  On

February 12, 2010, Dr. McCracken noted Plaintiff's premenstrual dysphoric disorder (PMDD)

was very severe, and that she had previously been treated for anxiety and depression. R. 421.

Plaintiff had a history of taking various psychotropic medications, but had been off all

medication for one and a half years.  R. 421.  Dr. McCracken opined that Plaintiff's mood

swings were extreme, particularly around her menses, and that she tended to get very depressed

after her cycle ended.  R. 421.  He also stated that Plaintiff has approximately ten "good days" a

month.  R. 421.  Dr. McCracken assessed PMDD at a deteriorated level, depression, and

hyperthyroidism, and prescribed Zoloft for her PMDD (later changed to Prozac).  R. 422.

On March 12, 2010, Dr. McCracken opined that Plaintiff started Prozac a few days

before her cycle and saw improvement in her moods.  R. 418.  He assessed her depression and

PMDD as improved, and also assessed hyperthyroidism. R. 419.  On June 11, 2010, Dr.

McCracken noted that Plaintiff's moods around her cycle were better, but her cycle itself was

still painful.  He also opined that Plaintiff was going to Brazil for a mission trip with her church,

but decided not to go in order to work on her family and emotional issues.  R. 415.  He once

again assessed her PMDD and depression as improved, and assessed hyperthyroidism.  R. 416.

He increased her Prozac dosage during her cycle and recommended counseling, which Plaintiff

declined.  R. 417.

On June 25, 2010, Plaintiff followed up with Dr. McCracken after a hospitalization for an overdose on Xanax, discussed below.  R. 412-14.  Dr. McCracken opined that Plaintiff went to therapy and felt better, and that she was "able to get her Prozac and PMDD better."  R. 412.  He also noted that she had no concerns that day, and she made progress at home.  R. 412.  He assessed PCOS as improved, and noted depression, PMDD, hyperthyroidism and endometriosis.  R. 413.  He also recommended individual and marriage counseling.  R. 414.

On November 1, 2010, Dr. McCracken noted that Plaintiff had been seen by Genesis Counseling Center, and that she continued to seek treatment there four times a week.  R. 409.  He also stated that Plaintiff was looking into a retreat to Livingstone Monastery through her church.  R. 409.  He assessed depression, PMDD and hyperthyroidism as ongoing, with new problems of substance abuse, posttraumatic stress disorder, and dissociative identity disorder, and prescribed Plaintiff new medication to help with her substance abuse issues. R. 411.  He noted that Plaintiff "dissociates during conversation" with her husband.  R. 410.

On December 12, 2010, Dr. McCracken opined that Plaintiff attended the monastery retreat, and that she found it helpful.  R. 406.  Plaintiff told Dr. McCracken that she did not drink on the retreat, but did have a few drinks when she returned.  R. 406.  Dr. McCracken assessed Plaintiff's substance abuse, posttraumatic stress disorder, dissociative identity disorder, depression and PMDD as improved, noted her PCOS and hyperthyroidism, and assessed a new problem of fibromyalgia.  R. 408.

On February 3, 2011, Plaintiff complained of fatigue and worse depression.  R. 403.  She also reported that she had quit cigarettes, marijuana and drinking, simultaneously, a month prior to the appointment, and had been handling stress "fairly well."  R. 403.  She told Dr. McCracken she was still going to counseling, but that she had not attended in a month, "due to co-pays."  R.

403.   Dr. McCracken assessed Plaintiff's substance abuse, posttraumatic stress disorder, fibromyalgia, depression, and PMDD as improved, her dissociative identity disorder as unchanged, and assessed a new problem of hypothyroidism.  R. 405.

On March 31, 2011, Plaintiff reported feeling better with a thyroid medication adjustment, and that she had quit smoking and drinking.  R. 395.  She also stated that her cycle was still painful and Ultram was not strong enough to relieve the pain.  R. 395.  Dr. McCracken's physician's assistant, Nicole Baranowski, assessed Plaintiff's hypothyroidism, substance abuse and depression as improved, her PMDD as unchanged, and her dissociative identity disorder as unchanged.  R. 396.

On August 12, 2011, Dr. McCracken stated that Plaintiff was doing well, and had worked hard to remove the stressors out of her life.  R. 390.  He also noted that the office was given a disability form to complete, and opined that due to Plaintiff's dissociative identity disorder, "any type of regular work causes stress and triggers an emotional breakdown, alternate personality, promiscuity, psychotic break from reality and depression/anxiety."  R. 390.  He also noted that she is worried that she is headed for mania.  R. 390.  He assessed fibromyalgia, hypothyroidism, posttraumatic stress disorder, substance abuse, dissociative identity disorder, depression, and PMDD.  R. 391.

At almost every visit during this time period, Dr. McCracken reported generally unremarkable psychiatric symptoms, including normal judgment and insight, appropriate mood and affect, and alertness and orientation.  R. 388-424.

### 3. Riverside Behavioral Health Center – Inpatient Psychiatric Treatment

On June 22, 2010, following an overdose on Xanax, Plaintiff was admitted to an in-patient psychiatric treatment facility, the Riverside Behavioral Health Center.  R. 333-43.  In her

admissions assessment, Ashraful Huq, M.D., opined that Plaintiff took "a fistful of Xanax," and her husband took her to the emergency room.  R. 333.  After a period of time, she suggested she was ready for discharge, left the hospital, and returned to her home.  R. 333.  Apparently once home, she and her husband had "interpersonal difficulties," and she took another three Xanax tablets.  R. 333.  The Xanax tablets were not prescribed to the Plaintiff, but were medications belonging to her father.  R. 333.  During an admission interview, Plaintiff stated that she took the Xanax because "she was tired of dealing with her husband," and confessed that she had been unfaithful to him.  R. 333.  Dr. Huq opined that Plaintiff "appeared to take no responsibility for her actions and behaviors," and had "reckless disregard for rules and norms."  R. 333.  Plaintiff told Dr. Huq that she took Prozac for mood symptoms and premenstrual dysphoric disorder, and that she had not had any crying spells since starting the Prozac.  R. 333-334.  Plaintiff indicated that she was active in church-related activities.  R. 334.  She also reported that the last time she was hospitalized, she went missing after her discharge and stated that she was involved with human trafficking at that time.  R. 334.  She denied suicidal or homicidal ideations and hallucinations.  R. 334.  She self-reported that she was an angry person, and that she was impulsive.  R. 334.

Dr. Huq also opined that, although Plaintiff had abstained from alcohol for about a year, she had relapsed into drinking and was drinking liquor and wine daily.  R. 334.  Plaintiff reported that she regularly smoked cannabis until she quit about a year prior to the hospitalization, had used crack cocaine in the past, and continued to use her father's Xanax.  R. 335.  Dr. Huq also noted that Plaintiff was a certified real estate appraiser, but was "staying home because the market is slow."  R. 335.

During her mental status examination, Dr. Huq opined that Plaintiff's hygiene was good, her eye contact was fair, and her gait and station were normal.  R. 336.  Dr. Huq also stated that Plaintiff's speech was spontaneous, her thought processes were generally linear, logical and goal directed, and she had no flight of ideas or loosening of associations, but she tended to externalize blame.  R. 336.  Plaintiff denied perceptual alterations, and did not reveal obsessions or delusions.  R. 336.  Dr. Huq described her affect as "in the restricted range," her insight as fair, and her judgment as poor, but found that Plaintiff's intelligence was average, her immediate recall was fair, and her short, long, and intermediate term memory was fair.  R. 336.  She was also alert and oriented to place, situation and time.  R. 336.  Dr. Huq opined diagnostic impressions of adjustment disorder with mixed disturbance of emotion and conduct, partner relational problem, alcohol abuse, sedative hypnotic anxiolytic abuse, premenstrual dysphoric disorder, and bipolar affective disorder for Axis I; personality disorder not otherwise specified with borderline histrionic and antisocial features for Axis II; status post intentional overdose on Xanax, uterine fybroids, ovarian cyst and status post cholecystectomy for Axis III; unemployment, financial stress, and conflicts with husband for Axis IV; and a current GAF[3] of 40 for Axis V.  R. 336-37.

On June 25, 2010, Plaintiff was released from inpatient care at Riverside Behavioral Health Center.  R. 338.  Her condition on discharge was stable and improved; she was not suicidal, homicidal or psychotic, and her behavior was appropriate, without any aggression or behavioral dysregulation.  R. 339.  She was instructed to follow up with Dr. McCracken, though she declined to follow up with a psychologist, and she was recommended to Genesis Counseling Center for therapy.  R. 340.

---

[3] The Global Assessment of Functioning (GAF) is a scale used to rate an individual's social, occupational and psychological functioning, used by mental health practitioners.  *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. 2000).

### 4. Genesis Counseling Center – Mental Health Counseling

On August 3, 2010, Plaintiff had a mental status examination with Genesis Counseling Center. R. 378-81. The report details Plaintiff's presentation problems, including her history of sexual abuse, her recent hospitalization, the fact that she has flashbacks, panic attacks and dissociation, and her marital issues. R. 379. The report also noted that Plaintiff had good social support; however, her relationships with her family members were strained. R. 379. The report showed that Plaintiff had a satisfactory attention span, good eye contact, normal muscular movement, and logical thought and association, during the examination, though it did indicate that her mood was anxious. R. 380. It also noted her current substance use, family history of posttraumatic stress disorder, grandiose delusions, obsessions and compulsions, and previous suicidal ideation. R. 380. However, it also indicated her high willingness for treatment and insight. R. 380. It listed Plaintiff's treatment goals as stabilizing her mood, building intimacy, and increasing her self-esteem. R. 381.

After the initial intake, Plaintiff saw therapist Brett Griffin[4] through February 14, 2011.[5] R. 358-77. During that period, Plaintiff was generally assessed with a GAF score of 57 or 58, with scores as low as 52 and as high as 59. R. 358-77. On Plaintiff's Behavior or Symptom Status scale, which ranged from 1 (resolved) to 5 (severe), Plaintiff generally scored 1-2, with 3s occurring earlier in treatment. R. 358-77. Progress toward Plaintiff's goals also received a numerical rating on the following scale: 1 (achieved), 2 (progress), 3 (no change), 4 (regression) and 5 (relapse). R. 358-77. Plaintiff generally scored a 2 or a 3, generally improving as therapy progressed, and only once scored a 4. R. 358-77.

---

[4] The Court defers to Defendant's footnote 4, detailing that though the signature on the therapy records is illegible, Plaintiff refers to her therapist as Brett Griffin and a Brett Griffin works for Genesis Counseling Center, and it adopts Defendant's conclusion. Def.'s Mem. In Supp. 9 n.4, ECF No. 15.
[5] Plaintiff was also seen by Genesis Counseling Center on January 19, 2012, but due to the nature of the report, the handwriting, and the signature, this Court believes she saw Dr. Olrick, and not therapist Griffin. R. 465.

On November 14, 2011, Plaintiff was hospitalized briefly for an accidental overdose of Tylenol PM. R. 455-61. She took twelve pills in a six-hour period. R. 457. The doctors noted that Plaintiff was alert, awake and appropriately oriented. R. 459. She was released after treatment for nausea and headache. R. 461.

### B. Reports by Plaintiff's Medical Providers

On August 13, 2010, Plaintiff underwent a psychological examination with Lydia Sagar, M.A., and Jeffrey Olrick, Ph.D., at the Genesis Counseling Center, after being referred there by Riverside Behavioral Health Center. R. 350-57. That examination generated a Psychological Report. R. 350-57. Ms. Sagar and Dr. Olrick performed the Conners' Continuous Performance Test – Second Edition, Dissociative Evaluation Scale, Millon Clinical Multiaxial Inventory – Third Edition, Posttraumatic Stress Disorder Checklist – Civilian Version, Rotter's Incomplete Sentence Blanks – Adult Form, Trauma Symptom Inventory, and Wechsler Abbreviated Scale of Intelligence. R. 351. They opined that Plaintiff presented as calm and amiable, who established rapport well and maintained eye contact throughout the procedures. R. 351. Plaintiff also demonstrated adequate comprehension, with adequate concentration and attention. R. 351. Her mood and affect were appropriate, she was oriented to time, place and person, and her thought process was logical, coherent and directed. R. 351.

Plaintiff's results from the Wechsler Abbreviated Scale of Intelligence put her in the "high average" range for both verbal comprehensive and reasoning abilities and visual-spatial reasoning abilities, giving her a high-average IQ overall. R. 351. The Conner's Continuous Performance Test revealed that Plaintiff's performance was strongly more consistent with non-clinical than and ADHD profile, but Plaintiff still had several notable response patterns. R. 352. Plaintiff's responses to the Millon Clinical Multiaxial Inventory – Third Edition showed

symptoms in the clinical range for anxiety, bipolar, dysthymia, alcohol dependence, and posttraumatic stress disorder for Axis I symptoms, and depressive, self-defeating and borderline for Axis II symptoms.  R. 352.  Her responses to the Trauma Symptom Inventory put her at clinical elevations on the Anxious Arousal, Depression, Anger/Irritability, Intrusive Experiences, Defensive Avoidance, Dissociation, Sexual Concerns, Impaired Self-Reference and Tension Reduction Behavior scales.  R. 353.  Based on the Posttraumatic Stress Disorder Checklist – Civilian Version, Plaintiff's answers suggest she is highly symptomatic.  R. 353.  On the Dissociative Evaluation Scale, Plaintiff "endorsed numerous and profound experiences of dissociation in her daily life."  R. 354.  The report notes that this can indicate serious psychopathology.  R. 354.  Plaintiff's responses to the Rotter's Incomplete Sentence Blanks – Adult Form were indicative of "significant internal distress namely, regret, intrusive disturbing thoughts and anxiety."  R. 355.  Based on the results of the tests, Ms. Sagar and Dr. Olrick assessed posttraumatic stress disorder, dissociative identity disorder, mood disorder NOS, personality disorder NOS, and borderline and dependent personality disorder traits.  R. 355.  They assessed a GAF of 50, and recommended medication changes or shifts, reduction of stress, various forms of therapy, and other behavioral interventions.  R. 355-57.

On March 25, 2011, Plaintiff's therapist from Genesis Counseling Center filled out a Mental Status Evaluation Form for Disability Determination Services.  R. 345-49.  In it, he indicated a diagnosis of posttraumatic stress disorder, dissociative identity disorder, and alcohol and cannabis use, noting a previous diagnosis of bipolar disorder.  R. 345.  The report states that Plaintiff had good social support from her friends but that her family relationships are strained.  R. 345.  It noted her history with alcohol, cannabis and prescriptions pill use, including the hospitalization for overdosing on Xanax, and her history as a victim in domestic disputes.  R.

345-46. The report also indicated Plaintiff's tendency to isolate herself in times of stress that brings pressure or responsibility, and indicated that Plaintiff struggled with her weight and fluctuating energy level. R. 346. It stated that Plaintiff had a history of job performance and "doing well until panic attacks and responsibilities overwhelm her." R. 346. It also opined that while Plaintiff had difficulties maintaining a household and governing her children, she had appropriate hobbies aside from episodic alcohol and cannabis use. R. 346. However, it indicated that the hobbies may cause a stress on Plaintiff's finances because she becomes passionately involved in a project but as the time, amount of responsibility and commitment increase, she becomes tired. R. 346.

The report also detailed Plaintiff's current mental status. R. 347-49. It indicated that Plaintiff's speech and appearance were typically normal, but occasionally pressured and animated when nervous. R. 347. She appeared well-groomed and dressed, with a "generally bright" affectation and a wide range of facial expressions. R. 347. However, she regularly dissociated in the presence of her husband, when addressing her history of abuse from her father and spouse, and "when processing events and activities producing feelings of shame." R. 347. When discussing painful events, she also had a high rate of confusion. R. 347. Plaintiff had memory difficulties in her immediate, recent and remote memories relative to her periods of dissociation. R. 347. She lacked organizational skills and the ability to follow through on challenging tasks, and had a history of delusion that manifested itself in "grandiose beliefs about [herself] as a socialite." R. 347. She had to regularly be grounded to the present and to the subject matter during her session, and struggled with abstract reasoning without concrete examples. R. 348. Her judgment was poor in decision-making, particularly because she used spending and cannabis or alcohol to relieve stress. R. 348. Her adaptive behaviors were

12

deteriorated, and though she could perform minimally she needed to be challenged in order to be enabled. R. 348.

On August 12, 2011, Dr. McCracken filled out a mental impairment questionnaire, where he opined that Plaintiff suffered from poor memory, appetite disturbance with weight change, some sleep disturbance, personality change, mood disturbance, emotional lability, delusions or hallucinations, substance dependence (though he notes it was in the past), frequent recurrent panic attacks, ahhedonia or pervasive loss of interests, psychomotor agitation or retardation with her panic attacks, paranoia or inappropriate suspiciousness (she thinks people are looking at her), feelings of guilt and worthlessness, difficulty thinking or concentrating, suicidal ideation and attempts, slurring of words and sentences, perceptual disturbances, frequent time and place disorientation, catatonia or grossly disorganized behavior, social withdrawal or isolation, blunt, flat or inappropriate affect, illogical thinking or loosening of associations, extremely decreased energy, manic syndrome, obsessions or compulsions, intrusive recollections of a traumatic experience, persistent irrational fears, generalized persistent anxiety, extreme somatization unexplained by organic disturbance, hostility and irritability, and pathological dependence or passivity. He assessed a fair prognosis, and indicated that he believed that the condition would last longer than twelve months. R. 389. He also stated that he anticipated Plaintiff's conditions would cause ongoing, daily, or permanent absentia from work, and that she would have a difficult time working at a regular job on a sustained basis. R. 389. He also assessed Plaintiff to have marked restrictions on activities of daily living and difficulties in maintaining social functioning, frequent deficiencies of concentration, persistence or pace resulting in a failure to complete tasks in a timely manner, and repeated episodes of deterioration or decompensation in work settings. R. 389.

On January 17, 2012, Dr. Olrick filled out an identical form, noting a GAF of 50 and Plaintiff's highest GAF in the past year as 55.  He identified Plaintiff as having symptoms of poor memory, personality change, mood disturbance, emotional lability, substance dependence, feelings of guilt or unworthiness, difficulty thinking or concentrating, suicidal ideation or attempts, time or place disorientation, intrusive recollections of a traumatic experience, generalized persistent anxiety, hostility and irritability, and pathological dependence or passivity. R. 463.  He opined that because of Plaintiff's dissociative identity disorder, she had sudden changes in consciousness that caused her to neglect daily work and social responsibilities, and that heightened stress caused Plaintiff to be vulnerable to suicidal behavior, drug use, and impulsive and reckless behavior.  R. 463.  He opined that Plaintiff's prognosis was poor, indicating that dissociative identity disorder is highly resistant to treatment.  R. 464.  He also stated that her condition would likely last over twelve months, and she would miss work "days to weeks at a time every several months."  R. 464.  He stressed that if she dissociated, she would be likely to not show up to work.  R. 464.  He also assessed Plaintiff to have marked restrictions on activities of daily living and difficulties in maintaining social functioning, frequent deficiencies of concentration, persistence or pace resulting in a failure to complete tasks in a timely manner, and repeated episodes of deterioration or decompensation in work settings.  R. 464.

### C. Opinions of State Agency Psychological Consultants

Plaintiff's case was reviewed by two state agency mental health consultants, Daniel Walter, Psy.D., LCP, and Patricia Bruner, Ph.D.  R. 80-83, 104-07.  Dr. Walter's examination took place on June 23, 2011.  R. 80-83.  He assessed Plaintiff as having severe affective disorders, personality disorders, and anxiety disorders.  R. 80.  He indicated that her restrictions on activities of daily living were mild, her difficulties in maintaining social functioning were

moderate, her difficulties in maintaining concentration, persistence or pace were moderate, and she had one or two episodes of decompensation of extended duration.  R. 81.  He also opined that, while Plaintiff's impairments could reasonably be expected to produce her symptoms, Plaintiff's statements about the intensity, persistence, and functionally limiting effects of her symptoms were not substantiated solely by the objective medical evidence.  R. 81.  He found that her statements regarding her symptoms were partially credible.  R. 81.  He opined that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures, ability to understand, remember and carry out short and simple instructions, her ability to sustain an ordinary routine without special supervision, her ability to make simple, work-related decisions, her ability to ask simple questions or request assistance, her ability to accept instructions and respond to criticism, and her ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  R. 82-83.  He assessed her as moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  R. 82-83.  He recommended a low stress working environment with limited contact with others.  R. 83.

Dr. Bruner's examination took place on October 3, 2011.  R. 104-07.  She assessed Plaintiff as having disorders of the thyroid gland, affective disorders, personality disorders, and anxiety disorders, but rated only the last three as severe.  R. 104.  She indicated that Plaintiff's

restriction on activities of daily living was mild, difficulties in maintaining social functioning was moderate, difficulties in maintaining concentration, persistence or pace as moderate, and she had one or two episodes of decompensation of an extended duration.  R. 104.  Dr. Bruner also stated that, while Plaintiff's impairments could reasonably be expected to produce her symptoms, Plaintiff's statements about the intensity, persistence, and functionally limiting effects of her symptoms were not substantiated solely by the objective medical evidence.  R. 105.  She reached substantially similar conclusions as Dr. Walter regarding Plaintiff's limitations on the variety of individual factors, and provided additional explanation that recent appointments with Plaintiff's doctor showed she was improving and making efforts to get better.  R. 106-07.

### D.  Statements by Plaintiff and her Family Regarding her Condition

#### 1. Function Reports

On April 17, 2011, Plaintiff's husband, Mr. Mason Williams, filled out a Function Report on Plaintiff's behalf.  He indicated that she took care of her children, but needed assistance to do so, and that she needed reminders to take care of her personal needs or to take her medication.  R. 257-58.  He opined that she could drive a car, and that she sometimes went out alone.  R. 259.  He also stated that she was unable to pay bills, handle a savings account, or use a checkbook or money order, but that she should count change.  R. 259.  He indicated that her condition affected her memory, understanding and concentration, and her ability to complete tasks, follow instructions, and get along with others.  R. 261.  He filed a three-page addendum to the function report, with more in-depth answers to the questions asked on the report.  R. 264-66.  In it, he stated that he must consistently remind her to take care of her personal needs, and while she was able to care for her children with assistance, his parents performed much of the care for her children.  R. 264.  He also opined that in the past she did not have difficulty remembering things,

16

but now she can no longer remember many things and she gets upset and overwhelmed easily. R. 264. He stated that she struggled to complete housework and other chores, and that she did not maintain good financial habits. R. 265. Speaking about her social life, he stressed that Plaintiff did not interact with many people other than himself and their children, and though she still liked to go to church, she had become increasingly withdrawn from any outside social activity. R. 265-66. Finally, he opined that she did not handle change in her routine very easily, was afraid someone was going to hurt her, and often panicked when someone looked at her directly. R. 266.

Plaintiff filed a Disability Report – Appeal on July 27, 2011. R. 277-83, 287-92. On it, she indicated that approximately ten days out of each month, she did not get out of bed or get dressed, and ate whatever she could find. R. 281, 290. She also changed her daily activities in an effort to avoid triggers. R. 281, 290. Finally, she stated that she lacked a sense of right and wrong, and that she had multiple personalities. R. 282, 291.

Plaintiff's husband filled out a Third Party Function Report on September 12, 2011. R. 293-308. He indicated that Plaintiff's condition affected her sleep, and her ability to bathe and feed herself without assistance. R. 295. He also stated that she needed a reminder of when to bathe, eat, and take her medication almost every day. R. 296. He opined that she used to cook very well and was extremely creative in the kitchen, but she did not cook as often anymore, and must be reminded to make food for herself and the rest of the family. R. 296. With regard to housework, he stated that sometimes she was very motivated to clean, but that she did not do laundry, household projects, dishes, yardwork, or clean the bathrooms. R. 296. When she did get motivated, though, she would start projects and sometimes wander away from long periods before returning. R. 297. He indicated that she mainly went outside to go to church and

17

counselling, and that she did not go out more, because she had fear and anxiety of dealing with other people.  R. 297.  He indicated that she could pay bills and count change, but could not handle a savings account or use a check or money orders.  R. 298.  He also stated that her anxiety had increased over the past two years, and as it did, her activities and willingness to interact with others decreased.  R. 298.  However, she did talk to people on facebook and see people at church on Sundays and Wednesdays.  R. 299.  He stated that her condition affected her memory, concentration, ability to complete tasks, understanding, ability to follow instructions, and her ability to get along with others.  R. 299.

Plaintiff's husband also included a five-page addendum to the form, outlining the everyday difficulties he and Plaintiff faced.  R. 304-08.  The first page and a half are identical to his earlier addendum.  R. 304-05.  He also stated that he and his parents must help Plaintiff take care of the children, and that Plaintiff, after a peak in 2010, had been on a steady decline.  R. 305.  She needed encouragement to do tasks, and sometimes would have no recollection of being asked to do something; additionally, the more pressure she felt to do something the more likely she was to dissociate.  R. 305.  He chronicled her difficulty with money and shopping, stating that ordinarily she did not like to go out to go shopping because being around people made her panic, but occasionally she became manic and overspent or got the family into monthly commitments they could not afford.  R. 306.  He also stated that she sometimes had anxiety and panic attacks around certain members of her family, and that each year she became more withdrawn from her relationships.  R. 306.  He said that the family started going to church to improve her quality of life, but that over the years she had become increasingly isolated.  R. 307.  In reference to her memory and concentration, he stated that because of her dissociation, her memory was "a big problem."  R. 307.  She also had "a very difficult time" concentrating on

18

anything for long periods of time, and while she may have completed tasks before starting new ones, it was rare. R. 307. Also, occasionally she would "decide to do something like paint the bathroom and lock herself in there all day for days at a time and not do anything else for the family." R. 307. He also opined that she "d[id] not seem to understand cause and effect thinking in all areas of her life." R. 307. Her ability to follow directions was entirely based on the task and her mood or personality. R. 308.

On December 5, 2011, Plaintiff filled out a disability report for her appeal. In it, she indicated that her anxiety attacks were becoming more intense, stating that she took too much medication and overdosed while trying to get her attacks under control. R. 317. In response to a question asking about new limitations since her last report, Plaintiff wrote "difficult to remember; difficult to concentrate, make decisions, quiet my mind." R. 317. In response to a question asking about new illnesses, injuries or conditions since her last report, Plaintiff wrote her medication overdose. R. 318. She also stated, in response to a prompt regarding how her illness affects her ability to care for personal needs, that her husband reminded her and encouraged her to complete tasks, and without that, she sat for hours doing nothing. R. 321. She also stated that her in-laws, other family members, and a friend helped her. R. 321.

### 2. Testimony Before the ALJ

Plaintiff had a hearing before the ALJ on April 24, 2012. R. 50-75. Plaintiff, represented by counsel, testified at the hearing regarding her impairment. R. 52-64. Plaintiff's husband also testified. R 65-69. Plaintiff indicated she was thirty-eight at the time of the hearing, and her highest level of education was a GED and real estate appraisal school. R. 54-55. She stated that she did not drive much, but that she did have a license with no restrictions. R. 55. She lived with her husband and four children, aged ten to twenty-one. R. 56.

Responding to a question from her attorney about her posttraumatic stress disorder, Plaintiff indicated that she will "lose time," where she will not remember periods of 20-30 minutes, but during that time she had done things like drive her car. R. 56-57. As a result, she generally only felt safe going out when her husband is also accompanying her. R. 57-58. Her husband also had to remind her to do things for her children, including feed them. R. 58. She stated that her in-laws took care of her children after school, and would bring them home only after her husband gets home. R. 59. She also indicated that they occasionally brought or made dinner, because while Plaintiff used to enjoy cooking, she now would burn things or forget. R. 59. Plaintiff also indicated that she was able to do some housework, but she got overwhelmed easily. R. 59-60. She stated that she spent most of her day sitting for hours, and sometimes checked Facebook five or ten times a day to catch up on the lives of her friends and relatives. R. 60. She also opined that she struggled with memory problems, and likely will only remember twenty percent of what happened in the hearing. R. 61. She had vivid and violent dreams when she sleeps, and often woke up exhausted. R. 61. She occasionally had paralyzing headaches, that could last for hours. R. 61-62. She spoke a bit about her history in therapy, saying that it helped to have answers for why she did the things that she did, but that she could not afford the kind of therapy that could help her get better. 62-64.

Plaintiff's husband also testified on his wife's behalf. He confirmed that she had difficulty keeping a household, and that he consistently had to call and remind her to do things throughout the day. R. 65-67. He also indicated that Plaintiff's relationship with their children was a loving one, though the children occasionally fended for themselves when he was not there, because she could not take care of them. R. 67-68. He also stated that making lists or writing instructions for Plaintiff are not helpful to her. R. 68.

A Vocational Expert ("VE") also testified at the hearing.  The VE testified that an individual with Plaintiff's characteristics, with a restriction to work only simple, routine, unskilled work, with low stress (defined as occasional changes in the work setting), occasional work-related decision making, and occasional interaction with the public, coworkers, and supervisors could perform such jobs as hand packer, laundry laborer, and kitchen helper.  R. 72-73.  However, if the individual suffered from anxiety, panic attacks, and depression, and would be off task for twenty-five percent of the time, there would be no job in the national economy available to that individual.  R. 73.  The VE indicated that employers typically tolerate no more than one or two unscheduled absences per month, and that needing breaks that exceeded the typical breaks scheduled into a workday would harm an individual's ability to find employment in a competitive market.  R. 73.

### III. <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g) (2011); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh

conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).

Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## IV. **ANALYSIS**

To qualify for SSI and/or DIB, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application, and be under a "disability" as defined in the Social Security Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security

Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents him from past relevant work, and (5) has an impairment that prevents him from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

"When proceeding through this five step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain and disability, and the claimant's educational background, age, and work experience." *Schnetzler v. Astrue*, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. *Hays*, 907 F.2d at 1456.

In reviewing the record, the Court RECOMMENDS that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED and the decision of the Commissioner be AFFIRMED.

### A. ALJ's Decision

In this case, the ALJ found the following regarding Plaintiff's condition. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2012. R. 26. First, fulfilling Step 1, Plaintiff did not engage in substantial gainful activity since October 7, 2009. R. 26. Second, Plaintiff's posttraumatic stress disorder, dissociative identity disorder,

mood disorder NOS, personality disorder NOS, and history of drug and alcohol abuse constituted severe impairments.  R. 27.  Third, through her date last insured, December 31, 2012, Plaintiff did not have an impairment or combination of impairments that meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 28.

Prior to the fourth step, the ALJ found that, through the date of the decision, Plaintiff had the residual functional capacity (RFC) to perform work at all exertional levels, but with limitations limiting Plaintiff to simple, routine unskilled work in a low-stress environment, defined as work that only involves occasional changes to the work setting and occasional work-related decision-making, with only occasional interaction with the public, coworkers, and supervisors.  R. 30.  Regarding step four, Plaintiff is unable to perform any of her past relevant work.  R. 34.  The plaintiff is between 18 and 49, has a high school equivalency education and can communicate in English.  R. 34.  Transferability of job skills did not factor into the ALJ's calculation, because the Medical-Vocational Rules support a finding that the claimant is not disabled, whether or not she has transferrable job skills.  R. 34.  Fifth, through the date last insured, when considering Plaintiff's age, education, work experience, and RFC, there were significant numbers of jobs in the national economy that Plaintiff could perform. R. 35. These findings led the ALJ to conclude Plaintiff was not under a disability at any time from October 7, 2009, through the date of the ALJ's decision. R. 35.

### B. Plaintiff Assignments of Error

In her Memorandum in Support of Plaintiff's Motion for Summary Judgment, Plaintiff alleges the ALJ made three errors in this case.  ECF No. 13.  Plaintiff claims the ALJ committed reversible error by giving improper weight to the determinations of Plaintiff's three treating physicians; giving improper weight to the determinations of the non-treating state agency

consultants; and by failing to make proper credibility findings as to the Plaintiff's and her husband's testimony. *Id*. at 2, 15, 21, 23.

### 1. The ALJ Properly Determined the Weight Given to Plaintiff's Treating Physicians' Medical Opinions

The Plaintiff alleges that the ALJ's failure to give controlling weight to Plaintiff's treating physicians is reversible error. Pl.'s Mem. In Supp. of Pl.'s Mot. for Summ. J. 15-21, ECF No. 13. Defendant argues that the ALJ's decision was reasonable because the ALJ properly weighed the evidence in front of him, and followed the Social Security Administration's regulations. Mem. In Supp. of Def't's Mot. for Summ. J. 14-19, ECF No. 15.

In making the RFC determination, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians. Under the federal regulations and Fourth Circuit case-law, a treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Conversely, "if [a] physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. However, a finding that a treating physician's opinion is not well-supported by medically acceptable clinical and diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. SSR 96-2, 1996 WL 374188, at *4 (S.S.A.).

The regulations require the ALJ to evaluate every medical opinion. Accordingly, even if a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors" provided by the regulations. *Id.* at *5. Those

25

factors are: (1) "[l]ength of treatment relationship and the frequency of examination;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

Under the applicable regulations, the ALJ is required to explain in his decision the weight assigned to *all* opinions, including treating sources, non-treating sources, State agency consultants, and other nonexamining sources. 20 C.F.R. §§ 404.1527(e), 416.927(e). Therefore, when the ALJ's decision is not fully favorable to the claimant, the decision must contain

> specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2, 1996 WL 374188, at *5 (S.S.A.). This specificity requirement is necessary because the reviewing court

> face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the records as a whole to determine whether the conclusions reached are rational.'

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

In this case, the ALJ followed the regulations above when he chose to discount the opinions of the treating source physicians. The ALJ outlined specifically that the treating physicians' opinions should not be given controlling weight because they were inconsistent with the record overall. R. 32-34. In his report, he carefully walked through all of the treatment

records from Plaintiff's various physicians, and concluded that the treatment notes, taken together, indicate that Plaintiff's "mental condition is usually stable and only aggravated during periods of marital discord." R. 32. To support that, he cited treatment notes from all three physicians that indicate improvement in Plaintiff's abilities after her hospitalization, including GAF scores in the high fifties, which indicate moderate symptoms and limitations. R. 31-33. He also noted that Plaintiff's symptoms appear for the most part to be precipitated by marital issues, and that throughout her treatment process Plaintiff showed good hygene, fair eye contact, normal motor activity, and good thought processes. R. 33. The ALJ concluded that the Plaintiff's treatment had been relatively conservative, and she responded to medication, both of which are supported by the record. R. 34. Because of this, there is substantial evidence to support the ALJ's decision not to give controlling weight to Plaintiff's treating physicians.

There is also substantial evidence to support the ALJ's discounting of Plaintiff's treating physicians' opinions. As stated above, the ALJ must look to a six-factor test in order to weigh any medical opinion presented in the record. The ALJ in this case clearly looked to the first two factors, the length of treatment and treating relationship, when he discounted the opinions of Dr. Olrick and Plaintiff's therapist. R. 32. He stated that Dr. Olrick only saw Plaintiff four times, and that Plaintiff's therapist had worked with her for less than a year. R. 32. It is within the ALJ's prerogative to determine whether the length of treatment and treatment relationship affect the weight he gives to a treating physician's opinion, and the ALJ fully justified his decision here. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), *see also* R. 32. However, this was not the only factor the ALJ uses to discount the opinions of Plaintiff's treating physicians. He also discussed the opinions' consistency with the record, and for the reasons he chose not to give the opinions controlling weight discussed in the paragraph above, he found that the treating

physicians' opinions were not consistent with the treatment records.  Based on these factors, this Court finds that there is substantial evidence to support the ALJ's decision to discount the treating physicians' opinions.

Plaintiff claims that the ALJ erred by considering the length of treatment and the treatment relationship between Plaintiff and her medical providers at Genesis Counseling Center. Pl.'s Mem. In Supp. 15-16, ECF No. 13.  However, Social Security regulations specifically mandate that the ALJ be able to evaluate those two factors in making a credibility determination, along with several other factors.  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). Regardless, the ALJ provided adequate reasoning for discounting the treating physicians' opinions by detailing how they are inconsistent with the medical record.  R. 32-34.  Additionally, Plaintiff argues that, because Dr. Olrick used several medically acceptable techniques to diagnose Plaintiff, that his opinion is supported by medically acceptable clinical and laboratory techniques.  Pl.'s Mem. In Supp. 18-19, ECF No. 13.  This is true; however, the test for whether a treating physician's opinion should be given controlling weight requires both factors, and as stated above, there is substantial evidence to support the ALJ's conclusion that Dr. Olrick's opinion is inconsistent with the rest of the record.  Defendant correctly notes in its brief that the ALJ did not discount Dr. Olrick's test results, but in fact used them to determine that Plaintiff had severe impairments at Step 2.  R. 27, Def.'s Mem. In Supp. 18, ECF No. 15.

Finally, Plaintiff claims that the ALJ substituted his own opinion for that of the treating physicians'.  Pl. Mem. In Supp. 19-20, ECF No. 13.  However, the Social Security Administration leaves the determination of disability solely up to the ALJ, essentially requiring the ALJ to determine the weight to give to medical opinions.  20 C.F.R. §§ 404.1527(d), 416.927(d).  Plaintiff cites *Ruiz v. Apfel* as an example.  98 F. Supp. 2d 200 (D. Conn. 1999).  In

that case, the court held that the ALJ had substituted his own opinion for the treating physician's opinion, finding that the ALJ's opinion was inconsistent with the record, that he focused on isolated instances of the plaintiff feeling better as proof to discount the treating physician, and that the ALJ made misleading statements and drew flawed conclusions from items in the record such as the physician co-signing a form rather than filling it out himself. *Id.* at 207-09. None of these instances are present here. In this case, the ALJ's opinion is consistent with the record; the record shows conservative treatment with improvement over time. R. 32-34. Instead of isolated instances of Plaintiff feeling better, the record reflects a slow but apparent improvement over time through therapy records. R. 358-77. The ALJ's logic and reasoning for discounting the treating physicians' opinions is clear and evidence-based, and follows the guidelines laid out in the Social Security regulations. Perhaps the strongest support that the ALJ is not simply substituting his own opinion for that of Plaintiff's treating physicians is the opinions of the two state agency psychological consultants, who support the ALJ's finding; their opinions show that the ALJ was not simply irrationally replacing the treating physicians' opinions with his own, but did so based on evidence in the record. R. 80-83, 104-07. Based on this and the above, there is substantial evidence in the record to support the ALJ's decision to discount the opinions of Plaintiff's treating physicians.

### 2. The ALJ Properly Determined the Weight Given to the State Agency Psychological Consultants' Medical Opinions

As stated above, the Social Security Administration requires an ALJ to evaluate every medical opinion using the factors provided in the regulation: (1) "[l]ength of treatment relationship and the frequency of examination;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. §§ 404.1527(c)(2)-(6),

416.927(c)(2)-(6).    Additionally, the ALJ is required to explain the weight assigned to *all* opinions, including treating sources, non-treating sources, State agency consultants, and other nonexamining sources. 20 C.F.R. §§ 404.1527(e), 416.927(e).

The ALJ properly gave significant weight to the state agency physicians.  In his decision, he discussed the state agency physicians' determinations and evaluated their relationship to the record.  R. 34.  The ALJ concluded that their opinions were supported by medical evidence and consistent with the record overall.  R. 34.  This Court concludes that there is substantial evidence in the record supporting the ALJ's decision to give the state agency physicians' opinions great weight.

Plaintiff is correct that the opinion of a non-treating or non-examining physician is not substantial evidence if it is contradicted by all evidence in the record.  Pl. Mem. In Supp. 21, ECF No. 13.  However, state agency consultants are considered experts in Social Security disability evaluation, and their opinions are considered valid unless all evidence in the record contradicts their findings.  Def.'s Mem. In Supp. 20, ECF No. 15, *citing Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986).  The record here reflects support for the state agency consultants, who found Plaintiff to have moderate difficulties, but not marked.  R. 80-83, 104-07, 358-77.  Additionally, while Plaintiff does raise a legitimate concern that, for those with mental disabilities, the workplace is significantly different from the home, the ALJ accounted for that when he assessed that Plaintiff should be limited to routine tasks in a low stress environment with limited contact with others.  R. 34.  Thus, there is substantial evidence that the ALJ properly gave significant weight to the opinions of the state agency consultants.

### 3. The ALJ Did Not Err by Discounting the Credibility of Plaintiff's and her Husband's Testimony

Next, Plaintiff asserts the ALJ failed to properly evaluate Plaintiff's or her husband's

credibility. Pl.'s Mem. In Supp. 23-25. The ALJ uses a two-step analysis in evaluating a claimant's subjective complaints. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably produce the claimant's pain or symptoms. *Id.* In doing so, the ALJ must consider all relevant medical evidence in the record. *Id.* If the underlying impairment could reasonably be expected to produce the claimant's pain, the ALJ must then evaluate the claimant's or witness's statements about the intensity and persistence of the pain, as well as the extent to which it affects the individuals' ability to work. *Id.* at 595. The ALJ's evaluation must take into account all available evidence, including a credibility finding of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the claimant's subjective statements. *Id.* at 595-96.

This Court must give great deference to the ALJ's credibility determinations. *See e.g., Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488-91 (1951). The Fourth Circuit has held, "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (internal citations omitted). Therefore, this Court must accept the ALJ's assessment of Plaintiff's and her husband's credibility unless it is unreasonable, contradicts other factual findings, or is based on an insufficient reason. *Id.*

Furthermore, as the Fourth Circuit recognizes, the Plaintiff's subjective statements about her pain are not, alone, conclusive evidence that plaintiff is disabled. 20 C.F.R. § 404.1529(a). Rather, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig v. Chater*, 76 F.3d 585, 591-92

(4th Cir. 1996). Finally, Social Security Ruling 96-7p states that the evaluation of a Plaintiff's subjective complaints must be based on consideration of all the evidence in the record, including, but not limited to: (1) medical and laboratory findings; (2) diagnoses and medical opinions provided by treating or examining physicians and other medical sources; and (3) statements from both the individual and treating or examining physicians about the claimant's medical history, treatment, response, prior work record, and the alleged symptoms' effect on the ability to work.

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Plaintiff's and her husband's statements "concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible." R. 30.   In reaching the determination regarding Plaintiff's and her husband's credibility, the ALJ addressed how the objective medical evidence did not support Plaintiff's subjective complaints, as well as Plaintiff's statements to her physicians during the relevant period. R. 30-34.  He described Plaintiff's "relatively conservative" treatment history and good responses to medication, her relatively stable progress including GAF scores in the high fifties, and Plaintiff's reversion or significant difficulty only when thinking about her history of abuse or problems with her marriage.  R. 33-34.  Because of this, the ALJ stated that he did not find it credible that "all work activity would cause her to decompensate." R. 34.

Substantial evidence supports the ALJ's finding that Plaintiff's and her husband's statements concerning the intensity, persistence, and limiting effects of these symptoms were not fully credible with respect to her condition through the date last insured, and the Court finds no "exceptional circumstances" exist that warrant reversing the ALJ's credibility determination. *See Edelco, Inc.*, 132 F.3d at 1011.

## V.  RECOMMENDATION

Based on the foregoing analysis, it is the recommendation of this court that Plaintiff's Motion for Summary Judgment (ECF No. 12) be DENIED and DISMISSED and Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. §  636(b)(1)(c):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules.  A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr*

*v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208 (1984).

_____/s/_____

Tommy E. Miller
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
May 8, 2014